**UNITED STATES DISTRICT COURT FOR THE**
**WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **CYNTHIA PACKER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. CIV-15-655-CG** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner,** | ) | |
| **Social Security Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Plaintiff Cynthia Packer brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of the Social Security Administration ("SSA") denying Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-434. The parties have consented to the jurisdiction of a United States Magistrate Judge. Upon review of the administrative record[1] and the arguments and authorities submitted by the parties, the Commissioner's determination is affirmed.

PROCEDURAL HISTORY AND ADMINISTRATIVE DECISION

Plaintiff protectively filed her DIB application on February 6, 2012, alleging disability because of a back injury, nerve damage, depression, and anxiety beginning on January 6, 2011. R. 193-200, 210, 214. Following denial of Plaintiff's application

---

[1] Citations to the administrative record (Doc. No. 10) are as "R. __," using the pagination assigned by the SSA in the certified copy of the transcript of the administrative record. Citations to other documents filed in this Court use the pagination assigned by CM/ECF.

initially and on reconsideration, a hearing was held before an administrative law judge ("ALJ") on October 9, 2013, at which Plaintiff and a vocational expert ("VE") testified. R. 35-54, 140-41, 142-48. The ALJ issued an unfavorable decision on January 28, 2014. R. 10-27.

As relevant in this matter, a person is "disabled" within the meaning of the Social Security Act if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment" that "has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner uses a five-step sequential evaluation process to determine entitlement to disability benefits. *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009); 20 C.F.R. § 404.1520. At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date. R. 15. At step two, the ALJ found that Plaintiff had one "severe impairment": "status post L4-5 dis[c]ectomy." R. 15-16. The ALJ also found that Plaintiff's "medically determinable mental impairment of depression" was "nonsevere." R. 16. At step three, the ALJ determined that Plaintiff's severe impairment did not meet or equal any of the presumptively disabling impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. 17.

The ALJ next assessed Plaintiff's residual functional capacity ("RFC") based on all of her impairments. *See* R. 17-21. The ALJ found that Plaintiff can

> perform less than light work as defined in 20 C.F.R. [§] 404.1567(b) except stand and/or walk at least 2 hours in an 8-hour workday; sit for a total of about 6 hours in an 8-hour workday; push and/or pull limited in [the] lower

extremities; occasionally climb ramps/stairs/ladders/ropes/scaffolds; occasionally balance, stoop, kneel, crouch, or crawl; limited to frequent feeling bilaterally; and avoid concentrated exposure to extreme cold or heat and vibration.

R. 17.

At step four, the ALJ found that Plaintiff's RFC would not allow her to return to her past relevant work as a lab assistant, phlebotomist, or call-center user-support analyst. R. 21. At step five, the ALJ considered whether there are jobs existing in significant numbers in the national economy that Plaintiff—in view of her age, education, work experience, transferable job skills, and RFC—could perform. R. 21-22. Relying on the VE's testimony, the ALJ determined that Plaintiff's transferable skills would allow her to adjust to the semiskilled occupations of mainline service dispatcher and radio dispatcher, and that Plaintiff could also perform the unskilled occupations of tap-room attendant and storage-rental clerk, and that such occupations offer "jobs existing in significant numbers in the national economy." R. 22; *see* R. 50-51. Therefore, the ALJ concluded that Plaintiff had not been disabled within the meaning of the Social Security Act between January 6, 2011, and January 28, 2014. R. 22-23. The Appeals Council declined to review that decision, R. 1, and this appeal followed.

## STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is limited to determining whether factual findings are supported by substantial evidence in the record as a whole and whether correct legal standards were applied. *Poppa v. Astrue*, 569 F.3d 1167, 1169 (10th Cir. 2009). "Substantial evidence is such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion." *Doyal v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003) (internal quotation marks omitted). "A decision is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it." *Branum v. Barnhart*, 385 F.3d 1268, 1270 (10th Cir. 2004) (internal quotation marks omitted). The court "meticulously examine[s] the record as a whole," including any evidence "that may undercut or detract from the ALJ's findings," "to determine if the substantiality test has been met." *Wall*, 561 F.3d at 1052 (internal quotation marks omitted). While a reviewing court considers whether the Commissioner followed applicable rules of law in weighing particular types of evidence in disability cases, the court does not reweigh the evidence or substitute its own judgment for that of the Commissioner. *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008).

## ANALYSIS

Plaintiff presents a scattershot of arguments on appeal. Primarily, she argues: (1) the ALJ erred at step two when he found that Plaintiff did not have a "severe" mental impairment; and (2) the ALJ's physical RFC assessment is flawed because it does not include largely unspecified limitations allegedly required to address Plaintiff's chronic back pain, cervical spine degeneration, radiculopathy, neuropathy, foot drop, numbness, muscle weakness, and incontinence. *See* Pl.'s Br. (Doc. No. 14) at 22-23, 7-22.

A.    *Severe Mental Impairment*

Plaintiff argues that the ALJ erred by not finding her impairment of "depression" (or "Bipolar depression") to be severe within the meaning of the Commissioner's regulations. *Id*. at 22-23.

1.    Relevant Evidence

Plaintiff alleged in her application for DIB that her "severe depression" and "severe anxi[e]ty" became disabling in January 2011.  *See* R. 214.  Plaintiff reported that she had received treatment for depression and anxiety for approximately one year, circa 2007.  R. 292-93.  She did not receive mental health treatment or medication between that period and March 2012 and was not receiving mental health treatment or medication at the time of the administrative hearing in October 2013.  R. 41, 293.

Plaintiff stated in an Adult Function Report in February 2012 that she experiences "severe depression due to" chronic pain and incontinence.  R. 222.  Plaintiff stated that while her mental condition affected her abilities to remember things and to get along with others, she was "[f]ine" with respect to "get[ting] along with authority figures," she could adapt to changes in her routine, and she enjoyed spending time with her family every week.  R. 226, 228.  In March 2012, Plaintiff's live-in boyfriend reported that he "sometimes" had to remind Plaintiff to take her medications but that Plaintiff had no trouble following instructions, getting along with others, handling stress, or adapting to changes in her routine.  R. 238, 240, 243-44.  At the administrative hearing in October 2013, Plaintiff testified that she still struggles with depression.  R. 41.  When asked how depression "affect[s her] ability to function," Plaintiff said that she does not "have the will" to "get up and do" things and "it's so much easier [to] just [lie] in bed and cry about it."  R. 41.

Further, the Commissioner obtained opinions regarding Plaintiff's mental health impairments and limitations from four state agency psychologists: (i) Sherri Murry, PhD,

who examined Plaintiff and issued a report on March 26, 2012 (R. 291-95); (ii) an unnamed reviewing consultant who completed a Psychiatric Review Technique ("PRT") form and Mental Residual Functional Capacity ("MRFC") assessment on April 24, 2012 (R. 310-13, 314-27); (iii) reviewing consultant Jennifer Meyer, PhD, who affirmed the opinions reflected in the prior reviewer's PRT and completed her own MRFC on April 25, 2012 (R. 328-31, 332); and (iv) reviewing consultant Don B. Johnson, PhD, who affirmed Dr. Meyer's MRFC in September 2012 (R. 346).

Dr. Murry observed that Plaintiff's mental status and behavior were within normal limits. R. 293. Dr. Murry diagnosed, among other things, "bipolar disorder, most recent event, hypomanic" and opined that Plaintiff's prognosis was good "as she has responded well to treatment in the past and could respond likewise with returning to treatment." R. 293-94. Dr. Murry also opined that Plaintiff's mood disorder and manic symptoms did "not impair her ability to take care of her own needs or the needs of her father." R. 292; *see also* R. 293. The three reviewing psychologists—assessing the functional limitations caused by Plaintiff's mental impairments, based upon Dr. Murry's examination findings and the other relevant records—each opined that Plaintiff had moderate limitations in three areas: (i) the ability to understand, remember, and execute detailed instructions; (ii) the ability to maintain concentration, persistence, and pace; and (iii) the ability to interact appropriately with the general public. R. 310-11, 324, 328-29, 346. Drs. Meyer and Johnson additionally opined that Plaintiff had a moderate limitation in her ability to ability to complete a work week without psychological interruption and to perform consistently without unreasonable breaks, as well as a moderate limitation in her ability

to adjust to changes in the work setting, opining specifically that Plaintiff can "adapt to simple/gradual changes" but "would have difficulty appropriately responding to changes in high-stress work environments." R. 328-29, 330, 346.

2.   The ALJ's Findings

At step two, the ALJ found that Plaintiff had the medically determinable impairment of depression and, applying the "special technique" prescribed by 20 C.F.R. § 404.1520a, rated "the degree of functional limitation" that this impairment caused Plaintiff in the three enumerated broad areas of mental functioning: "activities of daily living," "social functioning," and "concentration, persistence, or pace." R. 16; 20 C.F.R. § 404.1520a(c), (d).  The ALJ found that Plaintiff had "mild limitation" in each of these areas and had "experienced no episodes of decompensation [that] have been of extended duration."  R. 16; 20 C.F.R. § 404.1520a(c).  The ALJ concluded that Plaintiff's depression was a "nonsevere" medically determinable impairment because it did "not cause more than minimal limitations in [her] ability to perform basic mental work activities." R. 16.

The ALJ nevertheless considered the effects of Plaintiff's mental impairments when assessing Plaintiff's RFC.  *See* R. 19-20.  The ALJ included no mental limitations in the RFC determination.  R. 17.  In making this determination, the ALJ evaluated the opinions obtained from the state agency psychologists.  R. 20.  The ALJ gave those opinions "little weight," including in regard to the reviewers' findings of a moderate limitation in "concentration, persistence, or pace." R. 20; *see also* R. 16, 324, 332.  The ALJ, who had assessed this limitation as mild, explained that Plaintiff had "received no

mental health treatment and takes no medications for mental impairments" and Dr. Murry had opined that Plaintiff's "symptoms relat[ing] to a mood disorder did not impair her day to day functioning," including her ability to care for her ailing father and cook, clean, and drive. R. 20. The ALJ found that "there is no basis for limitations in the claimant's interaction with others," citing Plaintiff's lack of mental health treatment and that Plaintiff "has maintained a relationship with her boyfriend and has served as a caregiver for her father." R. 20. Finally, regarding the reviewers' findings that Plaintiff could perform "simple and some complex tasks" but was moderately limited in the ability to "carry[] out detailed instructions," the ALJ also gave those opinions "little weight." R. 20. The ALJ appears to have likewise based this differing assessment of Plaintiff's abilities on an absence of supporting evidence for the reviewers' conclusions, lack of mental health treatment, and Plaintiff's demonstrated ability to care for her ailing father. *See* R. 20.

### 3. Discussion

Plaintiff argues that the ALJ's determination that Plaintiff's depression was not a severe impairment within the meaning of the regulations was flawed because the ALJ failed to give "good" reasons for rejecting the opinions of the state agency psychologists. *See* Pl.'s Br. at 22-23. At step two of the five-step evaluation process, the ALJ must determine whether the claimant has a "severe" medically determinable impairment that significantly limits the claimant's physical or mental ability to perform basic work activities. *Wall*, 561 F.3d at 1052; 20 C.F.R. § 404.1520(c). Although "this step requires a 'de minimis' showing of impairment," the claimant must produce evidence of

functional limitations beyond "the mere presence of a condition or ailment" to show that the impairment is "severe." *Hinkle v. Apfel*, 132 F.3d 1349, 1352 (10th Cir. 1997); *see also* SSR 96-3p, 1996 WL 374181, at *2 (July 2, 1996).

Plaintiff's contentions are brief and general. First, she asserts that some of the ALJ's stated reasons for rejecting the opinions of the state agency psychologists are not "good." Pl.'s Br. at 22 ("There is nothing in the law that finds a one-time visit, or not taking medications makes evidence valueless."). None of the four psychologists were treating sources; thus, the ALJ was required only to "consider" and explain his weighing of their opinions, and to the extent any aspect of the opinions was rejected "to provide specific, legitimate reasons" for that rejection. *See* 20 C.F.R. § 404.1527(e)(2)(ii) ("[T]he [ALJ] must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant . . . , as the [ALJ] must do for any opinions from treating sources, nontreating sources, and other nonexamining sources who do not work for us."); *Doyal*, 331 F.3d at 764.

The ALJ's decision meets this standard. As detailed above, the ALJ explained that he gave the psychologists' opinions little weight because in various ways they were inconsistent with or not supported by the record as a whole, including evidence of Plaintiff's daily activities. R. 20; *see also* R. 293-94 (Dr. Murry observing that Plaintiff's mental health disorders did "not impair her ability to take care of her own needs or the needs of her father" with dementia, including to go to the father's home four times per day to bathe him, prepare his meals, administer medications, and clean the home). The specified reasons are legitimate bases for the ALJ to reject the nontreating psychologists'

opinions of Plaintiff's mental impairment. *See* 20 C.F.R. § 404.1527(c)(1), (3)-(4), (6), (e)(2)(ii); *cf. Lee v. Barnhart*, 117 F. App'x 674, 680-81 (10th Cir. 2004) (noting that a claimant's unexplained failure to seek or obtain mental-health treatment may indicate the "lack of a severe impairment").[2]

Second, Plaintiff argues that because the ALJ rejected all of the medical opinions on the severity of Plaintiff's mental impairment, the ALJ must have improperly substituted his own lay opinion for that of the medical experts in determining that Plaintiff's depression was nonsevere. *See* Pl.'s Br. at 22-23. Absent identification of any specific opinion that should have been adopted, Plaintiff's argument is simply a contention that an ALJ may never properly reject all opinion evidence and determine the severity of an impairment based on the remaining record. A similar proposition has been rejected by the Tenth Circuit in a decision that, while unpublished, is persuasive to this Court. *See McDonald v. Astrue*, 492 F. App'x 875, 885 (10th Cir. 2012) (citing *Chapo v. Astrue*, 682 F.3d 1285, 1288 (10th Cir. 2012)). The ALJ, not a psychologist, is

---

[2] In rejecting the PRT findings of the unnamed consultant, and affirmation of the same by Dr. Meyer, the ALJ noted Dr. Murry's diagnosis of bipolar disorder and that this diagnosis "was based on a one-time examination" and not supported by any independent mental health treatment. R. 16, 20. Because Plaintiff does not claim, in any clear or developed way, that the ALJ erred by failing to recognize bipolar disorder or mood disorder as a distinct medically determinable impairment, any such argument is waived. *See* Pl.'s Br. at 22-23; *Murrell v. Shalala*, 43 F.3d 1388, 1389 n.2 (10th Cir. 1994) (holding that to obtain judicial review it is insufficient merely to "suggest dissatisfaction" or mention an issue in the context of another argument). Moreover, like an error in failing to rank an impairment as severe, an error in failing to find a particular condition to be a medically determinable impairment can "be obviated if the ALJ considered the non-medically determinable impairment in assessing the RFC." *Ray v. Colvin*, No. 15-2149, 2016 WL 3974052, at *1 (10th Cir. July 20, 2016). Plaintiff does not argue that bipolar disorder or mood disorder caused any functional limitation that was not considered by the ALJ in his assessment of the effects of Plaintiff's depression. *See* Pl.'s Br. at 22-23.

responsible for determining whether the claimant has a "severe" medically determinable impairment based on all the relevant evidence in the record. 20 C.F.R. § 404.1520(a)(4)(ii), (c). As in *McDonald*, the Court disagrees with Plaintiff's implicit "contention that an ALJ is not competent, in the absence of a medical opinion, to assess the severity of mental symptoms and determine the extent of the limitations that result based on the evidence in [Plaintiff's] medical records" and "her daily activities." *McDonald*, 492 F. App'x at 885-86; *see* Pl.'s Br. at 22-23; *cf. Chapo*, 682 F.3d at 1288 ("[T]here is no requirement in the regulations for a direct correspondence between an RFC finding and a specific medical opinion on the functional capacity in question.").

Here, the ALJ cited specific, relevant evidence to support his findings that Plaintiff's depression caused at most "minimal limitations" in social interaction, activities of daily living, and maintaining concentration, persistence, or pace. *See* R. 16, 20. He also gave specific reasons, supported by substantial evidence in the record, for discounting or rejecting "evidence otherwise indicat[ing]" that Plaintiff's mental impairment caused "more than a minimal limitation in [her] ability to do basic work activities," 20 C.F.R. § 404.1520a(d)(1), including as to the opinion evidence discussed above. Plaintiff does not identify any functional limitation associated with her mental impairments that made any such impairment severe and was baselessly rejected by the ALJ. Pl.'s Br. at 22-23. Under these circumstances, it was proper for the ALJ to conclude that Plaintiff's depression was "not severe." *See* 20 C.F.R. § 404.1520a(d)(1); *Hinkle*, 132 F.3d at 1352 (explaining that "the mere presence of a condition or ailment"

does not establish that an impairment significantly limits the claimant's functional ability to perform basic work activities).

Even if that conclusion were error, the ALJ's discussion of the limitations caused by Plaintiff's mental impairments would render the error harmless. The failure to properly recognize an impairment as "severe" does not necessarily require reversal of an unfavorable decision. Such an error can be harmless if the ALJ continues past step two and, in evaluating the claimant's RFC considers the combined effect of all functional limitations caused by all of the claimant's impairments, whether severe or nonsevere. *Allman v. Colvin*, 813 F.3d 1326, 1330 (10th Cir. 2016) (holding that "the failure to find a particular impairment severe at step two is not reversible error when the ALJ finds that at least one other impairment is severe"). The ALJ did precisely these things, and Plaintiff does not attempt to establish that any specific mental functional limitation was erroneously omitted from the RFC finding. *See* R. 19-20; Pl.'s Br. at 22-23; *cf. Doyal*, 331 F.3d at 760 (stating that "[t]he claimant bears the burden of establishing a prima facie case of disability"); SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996) ("When there is no allegation of a physical or mental limitation or restriction of a specific functional capacity, and no information in the case record that there is such a limitation or restriction, the [ALJ] must consider the individual to have no limitation or restriction with respect to that functional capacity.").[3] In light of the ALJ's discussion of the combined

---

[3] Plaintiff does not specifically argue that the ALJ erred with respect to the reviewing consultants' opinions regarding working without psychological interruption, performing consistently without breaks, adapting to changes beyond the "simple/gradual," and "responding to changes in high-stress work environments." *See* Pl.'s Br. at 22-23; R.

effect of the functional limitations caused by Plaintiff's mental impairments whether severe or nonsevere, and absent establishment of any improper omission of a relevant functional limitation, Plaintiff has not shown that the ALJ's decision should be reversed.

## B.   *Plaintiff's Physical RFC*

Plaintiff argues that the ALJ's physical RFC assessment is flawed because it does not include largely unspecified limitations allegedly necessary to address Plaintiff's chronic back pain, cervical spine degeneration, radiculopathy, neuropathy, foot drop, numbness, muscle weakness, and incontinence.  *See* Pl.'s Br. at 7-22 (arguing that the RFC does not include "any" functional limitations related to these symptoms).

### 1.   Relevant Evidence

#### a.   *Treatment Records*

In February 2011, Plaintiff presented to her primary-care provider's clinic complaining of "significant" neck pain.  R. 280.  The treatment note reflects that an MRI conducted on January 18, 2011, revealed a bulging disc at C5 "causing spinal stenosis and flattening of the spinal cord," as well as "osteophyte complexus [with] a spinal cord narrowing at C6-7."  R. 280.  Plaintiff denied weakness but reported "radicular symptoms bilaterally" in four fingers.  R. 280.  In May 2011, Plaintiff told Martin Veal, MD, that she "had good control of her pain with [her] current meds," including Lortab and Robaxin.  R. 279.  The next month, Plaintiff reported that she was "doing well" and that her medications were "working well enough to enable her to carry out her normal ADL

---

328-29, 330, 346.  Further, Plaintiff does not argue that any associated functional limitation should have been included in the RFC that was not.  *See* Pl.'s Br. at 22-23. Any such arguments are waived.  *See Murrell*, 43 F.3d at 1389 n.2.

[i.e., activities of daily living] and to function well at her job." R. 278. In August 2011, Plaintiff expressly denied neck pain but reported "some mid back pain from time to time" and a persistent "vibration" feeling in her foot. R. 278. Dr. Veal denied Plaintiff's request to increase her daily dose of Lortab and instructed her to return in one month. R. 278. Plaintiff also reported "good control of her pain" in September 2011. R. 278.

On January 25, 2012, Plaintiff went to the emergency room complaining of severe "constant and sharp" pain in her lower back with numbness and tingling around her pelvis and in the right lower leg. R. 125-26. She also reported a single episode of urinary incontinence when coughing. R. 125, 129. An MRI showed "moderate mass effect on the right L5 nerve root, which [was] more pronounced than the suspected mass effect on the L4 nerve root." R. 127. On January 26, 2012, Dawn Tartaglione, DO, surgically removed a "large, extruded dis[c] fragment at L4-L5." R. 134. Plaintiff was discharged from the hospital on the same day with narcotic pain medications, unidentified "limitations on lifting, etc.," and instructions to resume "activity as tolerated." R. 132-33.

Plaintiff saw Dr. Tartaglione for a follow-up visit on February 27, 2012. Dr. Tartaglione recorded that Plaintiff's lumbar pain had improved immediately after surgery but since that time Plaintiff had experienced "continued right-sided leg pain and some weakness" in the right lower leg. R. 296. Plaintiff reported that she could walk without assistance and that her strength "seem[ed] to have improved" since surgery. R. 296. Upon examination, Dr. Tartaglione observed that Plaintiff walked "with a slightly antalgic gait" and "ha[d] 4+ out of 5 strength throughout on her right" lower leg. R. 296.

Dr. Tartaglione instructed Plaintiff to continue taking her pain medications and to start "some informal physical therapy" through a friend. R. 296-97. Plaintiff returned to Dr. Tartaglione's office on April 9, 2012. R. 298. She said that she continued to experience numbness and "occasion[al]" pain in her right leg and that she had fallen on occasion. R. 298. Upon examination, Dr. Tartaglione observed "some weakness" in Plaintiff's right leg but "[n]o gross deficit to sensation" or evidence of clonus in either lower extremity. R. 298. She instructed Plaintiff to start taking gabapentin for pain and to continue home exercises to strengthen her right foot. R. 298. Dr. Tartaglione also opined "that at this point it [was] not likely" that Plaintiff would "need any further surgical remedies." R. 298.

Plaintiff established care with Jason Leinen, MD, in late 2011 to manage her chronic pain. *See* R. 249. On February 1, 2012, Plaintiff returned to Dr. Leinen's office "to follow up on her low back pain and right lower extremity radiculopathy." R. 274. Upon examination, Plaintiff expressed "significant tender[ness] to palpation" of the lumbar spine and had a "significantly positive straight leg raise test on the right." R. 274. Dr. Leinen observed that Plaintiff walked "with a slow antalgic gait towards the right and ha[d] extreme difficulty with range of motion of the trunk secondary to pain." R. 274. Otherwise, Plaintiff's "physical examination [was] unremarkable." R. 274. Dr. Leinen refilled Plaintiff's Lortab and Percocet, prescribed Neurontin (gabapentin) for "neuropathic type" pain, and instructed Plaintiff to return in one month. R. 275. On February 29, 2012, Plaintiff told Dr. Leinen that she "continue[d] to have some degree of incontinence although mildly improved" and that she "continue[d] to have pain[] with

numbness, tingling or weakness down her right lower extremity." Plaintiff also reported that her surgeon had advised that her symptoms were "likely just residual from her nerve damage and would hopefully improve over time." R. 273. Upon examination, Dr. Leinen observed that Plaintiff walked "with a stable gait and transition[ed] well about the examination room." R. 273. Plaintiff again exhibited "limited range of motion of the trunk secondary to pain, as well as a positive straight leg raise test on the right." R. 273. A neurological exam revealed "mild weakness" on flexion and extension of the knee and ankle. R. 273. Plaintiff's "gross sensation [was] intact" despite her report that she "continues to have paresthesias into the right lower extremity." R. 273. Dr. Leinen instructed Plaintiff to keep taking Lortab "every day to help stabilize her pain" and to increase her Neurontin dosage "to see if this help[ed] with her radicular and neuropathic pains." R. 273.

Plaintiff saw Dr. Leinen four times between March and August 2012. *See* R. 334-35, 337-38, 340-41, 343-44. On each visit, Plaintiff reported that she continued to experience "significant pain, numbness, tingling, and weakness down her [r]ight leg." R. 337; *accord* R. 334, 340, 343. Dr. Leinen opined that Plaintiff's physical and neurological exams remained mostly "unchanged" from each previous visit—i.e., Plaintiff still exhibited "moderately" to "significantly" limited range of motion in the lower spine and walked with "a somewhat antalgic gait" and had "difficulty w[ith] transitions [moving] about the exam room." R. 341; *accord* R. 335, 338, 344.

Plaintiff also saw Dr. Leinen about once every month between November 2012 and July 2013. *See* R. 349, 350, 351, 353, 354, 355. In November, Plaintiff told Dr.

Leinen that "[s]he has difficulty finding a comfortable position to sit or stand in and continues to walk with somewhat of a drop foot type of gait." R. 355. Plaintiff also reported that she had been "fairly stable" on her current medications and that her condition was essentially "unchanged" since her last visit. R. 355. Dr. Leinen increased Plaintiff's Neurontin dosage based on her report that "this [wa]s one of the medications that ha[d] been the most beneficial to her [in] controlling her radicular pains." R. 355. The following month, Plaintiff reported that she "continue[d] to have pains on a daily basis, worse when she is up standing and walking," as well as "some right sided foot drop and occasionally drags her right foot." R. 354. Plaintiff told Dr. Leinen that the increased dose of Neurontin helped enough that she had been able to reduce her daily Lortab and could "sometimes" skip the nighttime dose all together. R. 354. Upon examination, Dr. Leinen opined that Plaintiff's "[l]ow back exam [was] essentially stable with persistent tenderness to palpation [of] the lower lumbar spine with pain into the buttocks and sciatic area." R. 354. Plaintiff also exhibited "moderate weakness with resistance" in the right lower extremity and had "some difficulty with transitioning from sit to stand" and moving around "the examination room secondary to pain." R. 354.

On January 17, 2013, Plaintiff told Dr. Leinen that, about a week earlier, she "felt an acute worsening of her pain in her lower back" when she lifted one of her grandchildren. R. 353. Plaintiff said that she was "back to a point where she can barely sit down" and that she had to "alternate positions frequently" to find a comfortable position. R. 353. Upon examination, Dr. Leinen observed that Plaintiff still walked with "an antalgic gait favoring the right with a noted foot drop on the right." R. 353. Dr.

Leinen's treatment notes from March, April, and July 2013, document similar symptoms and observations. *See* R. 349, 350, 351. The most recent treatment note contains Plaintiff's report that she "has been fairly stable with her current medications and dosages and feels like this current regimen is doing a good job at controlling her symptoms." R. 349 (July 3, 2013).

### b. *Plaintiff's Statements*

In February 2012, Plaintiff completed an Adult Function Report describing her medical impairments and related functional limitations. R. 222-29. Plaintiff reported that she could barely dress herself, could not shower alone, could not cut her own food, and needed help using the toilet. R. 223. Plaintiff reported that she could make her bed but that it took her 20 to 30 minutes. R. 224. She marked both "yes" and "no" next to questions asking if she could drive a car and leave the house alone. R. 225. When asked to describe how far she could "walk before needing to stop and rest," Plaintiff responded: "some days none, some days 10 feet," "most days if I stop to rest I cannot get back up." R. 227. Plaintiff also reported that she could not stand or sit long enough to watch TV, paint, cook, or go fishing. R. 226. In July 2012, Plaintiff reported that she left the house only to go to doctors' appointments and that she did not drive because of the numbness in her hands and legs and shooting pain in her right leg. R. 257. On both occasions, Plaintiff expressly denied that she used an assistive device such as a walker or cane. R. 228, 260.

At the administrative hearing, Plaintiff testified that she tried doing some data-entry work in early 2012 but quit within two weeks because she "couldn't sit in front of a

computer" all day. R. 38-39. Plaintiff stated that she tried to work again in August 2012 but failed the physical examination because she could not stand, walk, or lift. R. 45. Plaintiff testified that she now spent her days "hobbling around" at home but that she could "sometimes [drive] short distances" to pick up her grandchildren. R. 40. She also testified that Dr. Leinen had prescribed a rolling walker in early 2012 because she "had fallen and hurt [her]self again," but that she did not have the money to get the walker. R. 43. Plaintiff estimated that it took her over twenty minutes to walk from the parking lot to the hearing room and she had to "stop and regroup" along the way. R. 44-45.

Plaintiff also testified that she has experienced "complete incontinence" since undergoing back surgery in January 2012. R. 39. She stated that she wears adult diapers "all day, every day" because she does not know when she "need[s] to go to the restroom." R. 39, 42. She estimated that she uses "[s]ix to eight" diapers per day and that she had to shower and change clothes three times a day because she soils her clothes. R. 42.

### c. *Opinion Evidence*

On March 26, 2012, state-agency consultant S.A. Chaudry, MD, examined Plaintiff primarily to evaluate her allegation that she had decreased sensation and limited use of her upper extremities. *See* R. 308. Plaintiff told Dr. Chaudry that she experienced neck aches, lower-back pain, and numbness and tingling in the right leg, and that she could sit, stand, or walk unassisted for only five minutes at a time. R. 284, 285. Upon examination, Dr. Chaudry observed that Plaintiff exhibited a "slow" gait and that she had more difficulty walking on her right heel and toes than she did on her left heel and toes.

R. 286, 290.  Plaintiff had normal strength and motor function in both hands, but she exhibited diminished sensation in some fingers.  R. 285-86.

On April 11, 2012, state-agency consultant Jeffrey Wheeler, MD, reviewed Plaintiff's records available through March 29, 2012, including Dr. Chaudry's report. *See* R. 144, 301-09.  Dr. Wheeler opined that Plaintiff could: occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; sit for about six hours during an eight-hour workday; stand and/or walk for about four hours during an eight-hour workday; occasionally operate foot controls using her right lower extremity; occasionally climb ramps, stairs, ladders, ropes, and scaffolding; and occasionally balance, stoop, kneel, crouch, or crawl.  Further, Plaintiff must "avoid concentrated exposure" to extreme temperatures and vibration and was limited to "[f]requent feeling bilaterally."  R. 302-05, 309.  Dr. Wheeler explained that Plaintiff's "[t]reating source exams [were] consistent with [Dr. Chaudry's] physical exam of the lower extremities, showing some weakness but ambulatory [without] an assistive device."  R. 309.  He also explained that the medical evidence supported imposing "some limitation" on Plaintiff's ability to stand and walk but Plaintiff's own description of her daily activities in March 2012 "tempered" any apparent need to restrict these exertional activities beyond four hours in an eight-hour workday.  R. 309.  On September 20, 2012, state-agency consultant Suzanne Roberts, MD, reviewed the medical records and affirmed Dr. Wheeler's RFC assessment.  R. 347.

On March 8, 2013, Dr. Leinen wrote a letter supporting Plaintiff's application for disability benefits.  R. 352.  Dr. Leinen noted that Plaintiff had "clinical and radiological

findings for lumbar disc pathology with associated lower extremity radiculopathy that has led to chronic low back pain and associated right lower extremity numbness, tingling, and weakness with a current right lower leg foot drop." R. 352. He opined that Plaintiff's L4-L5 discectomy "provided temporary relief followed by a return of symptoms that have seemingly worsened over the past few months" and "have made it to the point that she cannot work." R. 352. "At this point," Dr. Leinen continued, Plaintiff was "significantly limited . . . [in] her ability to ambulate and transition from sit to stand, etc.[,] which prevents her from working at a full capacity for a variety of different job activities." R. 352.

### 2. The ALJ's Findings

After summarizing most of the medical and other evidence in Plaintiff's record, the ALJ found that Plaintiff retained the capacity to "perform less than light work as defined in 20 C.F.R. [§] 404.1567(b)," with the following limitations:

> stand and/or walk at least 2 hours in an 8-hour workday; sit for a total of about 6 hours in an 8-hour workday; push and/or pull limited in lower extremities; occasionally climb ramps/stairs/ladders/ropes/scaffolds; occasionally balance, stoop, kneel, crouch, or crawl; limited to frequent feeling bilaterally; and avoid concentrated exposure to extreme cold or heat and vibration.

R. 17, 18-21.

Regarding the opinion evidence, the ALJ gave "great weight" to Dr. Wheeler's and Dr. Roberts' assessments of Plaintiff's functional limitations, which the ALJ

essentially adopted.  R. 21; *see* R. 301-09, 347.[4]  The ALJ gave "some weight" to Dr. Leinen's opinion that Plaintiff's "overall" condition and symptoms had deteriorated "to the point that she cannot work" and that Plaintiff was "significantly limited in her ability to ambulate and transition from sit to stand, etc., which prevents her from working at full capacity [in] a variety of different job activities."  R. 21; *see* R. 352.  The ALJ stated that this opinion of Dr. Leinen "is not inconsistent with" the ALJ's own RFC determination. R. 21 (citing R. 291-95).  The ALJ also stated, presumably in rejecting Dr. Leinen's opinion to the extent it called for limitations greater than in the RFC, that such opinion was "inconsistent with" Plaintiff's "activities of daily living," specifically those that she performed as her ailing father's primary caregiver.  R. 21.

Regarding Plaintiff's descriptions of her pain and symptoms, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause [her] alleged symptoms" but that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely credible for the reasons explained in [the] decision."  R. 18.  The ALJ gave several reasons for rejecting Plaintiff's complaints that her symptoms—including chronic pain, neuropathy, muscle weakness, and incontinence—were so severe or continuous that they kept her from

---

[4] In his PRFCA, Dr. Wheeler checked the box indicating that Plaintiff could stand and/or walk with normal breaks "at least 2 hours in an 8-hour workday" but further specified that Plaintiff's ability to "[s]tand/walk. . . is estimated at about 4 hours in an 8-hour workday."  R. 302, 309.  The RFC as set forth in the ALJ's decision reflects the first but not the second aspect of this opinion.  *See* R. 17.  Plaintiff does not challenge in any specific or developed way either (i) whether the stand/walk limitation in the RFC is supported by substantial evidence, or (ii) whether the ALJ properly weighed and discussed Dr. Wheeler's opinion in this specific regard.  Any such arguments are waived. *See Murrell*, 43 F.3d at 1389 n.2.

working with certain restrictions. *See* R. 17, 18-20, 21. He found that Plaintiff's reports that she had been "prescribed a rolling walker" and that she experienced incontinence were "not consistent with the medical evidence of record." R. 20. The ALJ also referenced Plaintiff's "daily activities," particularly those that Plaintiff said she performed as her ailing father's primary caregiver. *See* R. 16, 19, 20, 21, 222-29, 254-61.

3.  Discussion

A claimant's RFC represents the most work-related activity he or she can do in an ordinary workplace setting on a regular and continuing basis despite the combined limiting effects of his or her medically determinable impairments. *See* 20 C.F.R. § 404.1545; SSR 96-8p, 1996 WL 374184, at *2, *5. "The RFC assessment must be based on *all* of the relevant evidence in the case record" and "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence," including the claimant's complaints of pain or other symptoms. SSR 96-8p, 1996 WL 374184, at *5, *7; *see also Poppa*, 569 F.3d at 1171. Here, Plaintiff argues that the ALJ's determination of Plaintiff's RFC is flawed for a variety of reasons, which are discussed in turn below.

a.  *Pain and Other Symptoms Caused by or Associated with Spinal Degeneration*

Plaintiff argues that the ALJ's RFC determination does not "include any limitations [related to] her pain" and does not reflect proper consideration of a litany of other conditions, including radiculopathy, neuropathy, muscle weakness, numbness, and foot drop. *See* Pl.'s Br. at 7-8, 11-17, 18. These objections are meritless.

As an initial matter, Plaintiff presents these arguments in scattershot fashion, at times treating the conditions listed above as limitations associated with spinal degeneration at the lumbar level, and at other times claiming certain of the conditions as independent impairments. *Compare id*. at 14-15 (noting symptoms of "right lower extremity radiculopathy and numbness, tingling, weakness with a current right lower leg foot drop and chronic low back pain" in discussing "the condition the ALJ found severe"), *with id*. at 15 (arguing ALJ failed to properly consider "additional impairments of foot drop, radiculopathy and pain"). The ALJ discussed the conditions listed by Plaintiff as limitations connected to the spinal degeneration that led to and remained after her lumbar surgery. *See* R. 15 (describing Plaintiff's severe impairment as "status post L4-5 dis[c]ectomy"). The Court discerns no error in the ALJ's characterization of the cited conditions, which is consistent with the medical records and opinions. *See*, *e.g.*, R. 334-35. Moreover, because the ALJ found at least one severe medical impairment, any failure to treat any such cited condition as an independent impairment would not be reversible error in and of itself. *See Allman*, 813 F.3d at 1330.

Contrary to Plaintiff's suggestion, the ALJ did not ignore or deny that Plaintiff's musculoskeletal impairments caused chronic pain or other symptoms, but instead specifically noted medical records and opinion evidence indicating that Plaintiff experienced pain, numbness, tingling, weakness, and foot drop, including in her right leg. *See* R. 17-20; *see also Jeffries v. Soc. Sec. Admin.*, 358 F. App'x 25, 34 (10th Cir. 2009) (rejecting claimant's argument that ALJ failed to consider that back pain continued after treatment when ALJ "never denied" that was so). The ALJ explicitly relied on the

findings of Dr. Chaudry, who had noted essentially the same complaints and examined Plaintiff's range of motion and use of her extremities in light of the totality of her symptoms. *See* R. 19, 21, 284-90. The ALJ also relied on the assessment by Drs. Wheeler and Roberts of exertional, postural, and environmental limitations to address the totality of the functional limitations observed by Dr. Chaudry. *See* R. 20-21, 309, 347. The ALJ essentially adopted in the RFC the exertional, postural, and environmental limitations assessed by Drs. Wheeler and Roberts. R. 17, 20-21. *But see supra* note 4.

Plaintiff has not established, nor does the Court otherwise discern, that any medical record or other significantly probative evidence overwhelms the evidence cited by the ALJ such that it must be concluded that Plaintiff's medical impairments and related symptoms caused functional limitations beyond what the ALJ included in the RFC. Plaintiff suggests only two possible additional limitations: (i) a "limited ability to sit for extended periods," and (ii) a "need for extra breaks due to pain." Pl.'s Br. at 15.

The ALJ included in the RFC a limitation on the amount of time that Plaintiff could sit, R. 17, which is supported by substantial evidence. The ALJ's determination that Plaintiff could sit for only about six hours during a normal eight-hour workday is consistent with Dr. Wheeler's assessment of Plaintiff's functioning, confirmed by Dr. Roberts. *See* R. 302, 309, 347. As support for a greater limitation on sitting, Plaintiff cites Dr. Leinen's opinion that Plaintiff's back pain, lower-extremity muscle weakness, and radiculopathy or neuropathy limited Plaintiff's "ability to ambulate and transition from sit to stand." Pl.'s Br. at 15; *see* R. 352. As is clear from the quoted statement, however, that opinion speaks to a limitation on walking and transitioning between sitting

and standing positions and does not include a limited duration for sitting. *See* R. 352. Plaintiff cites no other evidence that would support a greater sitting limitation, much less overwhelm the evidence relied on by the ALJ.

Regarding a need for "extra breaks due to pain," Plaintiff cites no specific evidence but does criticize, in a general way, the ALJ's assessment of Plaintiff's credibility in describing the limiting effects of her pain. As a general rule, an ALJ cannot reject a claimant's "statements about the intensity and persistence of [his or her] pain or other symptoms or about the effect [those] symptoms have on [the claimant's] ability to work solely because the available objective medical evidence does not substantiate" the claimant's complaints. 20 C.F.R. § 404.1529(c)(2); *see also Luna v. Bowen*, 834 F.2d 161, 165 (10th Cir. 1987). Rather, the ALJ must consider the claimant's statements against all of the relevant evidence in the record, such as:

- medical-source opinions about the claimant's impairments and limitations;
- medical signs, findings, and observations;
- the claimant's daily activities;
- the location, duration, frequency, intensity of the claimant's pain and other symptoms, as well as any mitigating or aggravating factors; and
- the type, dosage, effectiveness, and side effects of any medication (or other treatment) the claimant takes or has taken to alleviate the alleged pain or other symptoms.

*See* 20 C.F.R. § 404.1529(c)(3). The ALJ must give "specific reasons," "closely and affirmatively linked to" relevant evidence in the record, for the weight he or she gives a claimant's complaints. *Wilson v. Astrue*, 602 F.3d 1136, 1144 (10th Cir. 2010). "Credibility determinations are peculiarly the province of the [administrative] finder of

fact, and [courts] will not upset such determinations when supported by substantial evidence." *Id.* (internal quotation marks omitted); *see also Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000) (holding that an ALJ need not engage in "a formalistic factor-by-factor recitation of the evidence" "[s]o long as the ALJ sets forth the specific evidence he relies on in evaluating the claimant's credibility").

The Court finds that the ALJ's analysis of Plaintiff's pain and other symptoms was sufficient in this case. *See Wall*, 561 F.3d at 1068. "Here, the ALJ discussed all of the relevant medical evidence in some detail" after summarizing Plaintiff's subjective complaints and alleged functional limitations. *Id.* (internal quotation marks omitted); *see* R. 18-21. "This discussion demonstrates that the ALJ considered" the relevant factors in assessing Plaintiff's symptoms, including her favorable response to pain medications, the nature of her medical treatment, the available medical opinions, the findings on multiple physical exams throughout the relevant period, and Plaintiff's own description of her daily activities. *Wall*, 561 F.3d at 1068; *see* R. 18-20, 21. Accordingly, the Court finds that the ALJ set forth specific evidence and reasons for discounting Plaintiff's complaints of debilitating pain and other symptoms and that the ALJ's conclusions are supported by substantial evidence in the record.[5]

---

[5] To the extent Plaintiff bases her argument for a greater sitting limitation on a challenge to the ALJ's assessment of the credibility of Plaintiff's reports and testimony, that challenge fails for much the same reasons set forth regarding the need for extra breaks. As noted, the ALJ in making the relevant RFC determination relied on Dr. Chaudry's examination findings, Dr. Wheeler's and Dr. Roberts' opinions about Plaintiff's impairments and limitations, and Plaintiff's description of her daily activities. These are legitimate reasons for the ALJ to discount Plaintiff's allegations that her symptoms prevent her from sitting, standing, or walking for more than a few minutes at one time.

"[D]isability requires more than mere inability to work without pain." *Ray v. Bowen*, 865 F.2d 222, 225 (10th Cir. 1989) (internal quotation marks omitted). Plaintiff has not shown that the ALJ's RFC determination fails to reasonably accommodate her established pain and other symptoms or identified any evidence in the record that actually "conflicts with the ALJ's conclusion that [she] can perform light work" with additional restrictions on standing, walking, sitting, posturing, and feeling throughout a normal workday. *Howard v. Barnhart*, 379 F.3d 945, 947 (10th Cir. 2004); *see* Pl.'s Br. at 8-9, 13-15, 17. To the contrary, insofar as the points raised, the ALJ's determination of Plaintiff's physical RFC was reached through proper application of legal standards and is supported by substantial evidence.

### b. Incontinence

Plaintiff alleges that the ALJ improperly rejected Plaintiff's testimony describing the extent of her incontinence as "not consistent with the medical evidence of record." R. 20. Although the ALJ did not specifically cite any conflicting evidence, the record as a whole contains substantial evidence to support the ALJ's finding that Plaintiff's testimony did not accurately reflect this symptom's intensity, persistence, or limiting effects. *See Wall*, 561 F.3d at 1052. For example, there are only two treatment notes documenting Plaintiff's reports to a healthcare provider that she experienced incontinence

---

*See* 20 C.F.R. § 404.1529(c)(3)(i); *see, e.g.*, R. 293 (Dr. Murry stating, "Although [Plaintiff] reported a great deal of physical limitations in her disability and function reports, based on her report during this exam, she is not endorsing such limitations" in her current activities of daily living), 309 (Dr. Wheeler opining that Plaintiff's allegation that she could sit, stand, or walk unassisted for only five minutes at one time was "completely inconsistent" with her description of her daily activities).

during the relevant period. On January 25, 2012, Plaintiff reported a single episode of urinary incontinence with strenuous coughing. R. 125, 129. In late February 2012, Plaintiff told Dr. Leinen that she experienced "some degree of incontinence" after her surgery and that her neurosurgeon had advised that this symptom was "likely just residual from her nerve damage and would hopefully improve over time." R. 273. One month later, Plaintiff expressly denied experiencing incontinence. R. 284-85. Treatment notes dated between April 2012 and July 2013 contain no indication that Plaintiff ever reported experiencing incontinence, let alone to the degree Plaintiff described in her hearing testimony. *See* R. 298, 334-45, 349-55.

These significant, unexplained conflicts between Plaintiff's "subjective complaints" and her "statements to [her] treatment providers" provided legitimate grounds for the ALJ to reject Plaintiff's testimony that she experienced ongoing severe incontinence. *Jones v. Colvin*, 647 F. App'x 878, 883 (10th Cir. 2016). Accordingly, the ALJ did not err by failing to include incontinence-related restrictions in the RFC assessment, and this omission does not render the RFC unsupported by substantial evidence. *See Qualls*, 206 F.3d at 1372 (finding no error where RFC did not include alleged restrictions that were not supported by the medical record).

### c. *Radicular Neuropathy and Numbness Caused by Spinal Degeneration at the Cervical Level*

Plaintiff objects that the ALJ did "not consider" her allegations that "cervical problems" caused "severe" "radicular neuropathy and numbness in her extremities." Pl.'s Br. at 19-21. Specifically, Plaintiff argues that the state-agency physicians "never

reviewed" a January 2011 MRI showing degeneration or other "problems" at the cervical, as opposed to lumbar, level of her spine and, thus, did not properly consider the pain and numbness that condition caused in her upper extremities. *Id.* at 19, 20. She therefore contends that these physicians' opinions "cannot constitute substantial evidence" supporting the ALJ's RFC assessment. *Id.* at 20-21.

Contrary to Plaintiff's premise, the record shows that this condition—and certainly its functional effects—were considered by the state-agency physicians and by the ALJ. There is no suggestion by Plaintiff that the records provided to and reviewed by the state-agency physicians failed to include the treatment note discussing this January 2011 MRI. *See id.* at 19-21; R. 280. Dr. Chaudry expressly discussed Plaintiff's cervical spine condition and related symptoms, including pain when moving and diminished sensation in her fingers. R. 285. He then examined Plaintiff's range of motion in her cervical spine and use of her extremities, including her fingers. R. 290, 287-88, 289; *see also* R. 286 (Dr. Chaudry noting impression of neuropathy in fingers of both hands). Drs. Wheeler and Roberts reviewed these records and assessed exertional, postural, manipulative, and environmental limitations to address the totality of the functional limitations observed by Dr. Chaudry. *See*, *e.g.*, R. 302, 309 (Dr. Wheeler opining that Plaintiff required limitations on standing, walking, and using her right lower leg, as well as restrictions on exposure to extreme temperatures and time spent on tasks "requiring intact sensation in the ring and small finger" in order to accommodate Plaintiff's "decreased sensation in the ulnar nerve distribution bilaterally"); R. 347 (Dr. Roberts affirming Dr. Wheeler's opinion after "review[ing] all of the medical evidence in the file").

The ALJ likewise expressly noted evidence of Plaintiff's cervical spine condition and discussed the January 2011 MRI. R. 18-19. Although the ALJ did not find degeneration of the cervical spine to be a separate medically determinable impairment, he as noted essentially included in the RFC the exertional, manipulative, postural, and environmental limitations assessed by Drs. Wheeler and Roberts. R. 17, 20-21. Thus, the ALJ's RFC reflects limitations on sitting, standing, and walking; being exposed to extreme temperatures; climbing ladders, ropes, and scaffolding; and feeling with the fingers. R. 17, 18-21.

Plaintiff does not explain how this RFC fails to accommodate the "radicular neuropathy and numbness in her extremities" caused by her "cervical problems," or—more pointedly—identify any functional limitation associated with that condition that the ALJ erroneously omitted from the RFC. *See* Pl.'s Br. at 21-22. The Court finds no legal error or lack of substantial evidence as to the ALJ's analysis of Plaintiff's cervical impairment and related functional limitations.

### d. The ALJ's Analysis of Dr. Leinen's Opinion

In the course of making the above arguments, Plaintiff also objects that the ALJ impermissibly "cherry-picked" portions of Dr. Leinen's opinion that supported the ALJ's unfavorable conclusion while "ignoring" the portions that arguably supported Plaintiff's disability claim. *See* Pl.'s Br. at 18-19. The Court disagrees.

The ALJ—who assigned Dr. Leinen's treating physician opinion "some weight"—sufficiently explains that he largely accepted Dr. Leinen's opinion that Plaintiff's back pain, lower-extremity muscle weakness, and radiculopathy or neuropathy "significantly

limited . . . her ability to ambulate and transition from sit to stand," which prevented Plaintiff "from working at a *full capacity* for a variety of different job activities," R. 352 (emphasis added), having found that opinion to be "not inconsistent with" the ALJ's ultimate RFC determination. R. 21. Further, the ALJ's discussion of Dr. Leinen's opinion sufficiently explains that he rejected any suggestion that Plaintiff is completely disabled on the ground that such opinion was "inconsistent with" Plaintiff's "activities of daily living," particularly those that she performed as her ailing father's primary caregiver. R. 21.

This was not "cherry-picking" but a proper weighing of a treating-source opinion. *See* 20 C.F.R. § 404.1527(c)(2) (ALJ must "give good reasons" for the weight assigned to a treating-source medical opinion); *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003) (directing that the ALJ's explanation "'must be sufficiently specific to make clear to any subsequent reviewers the weight the [ALJ] gave to the treating source's medical opinion and the reasons for that weight'" (quoting SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996))). In particular, the ALJ gave a specific, legitimate reason for rejecting any suggestion by Dr. Leinen that Plaintiff cannot work at all. R. 21; *see also* 20 C.F.R. § 404.1527(d)(1), (3) (noting that the ALJ "will not give any special significance" to a treating physician's opinion that the claimant is "unable to work"). The Court finds no legal error or lack of substantial evidence with the ALJ's analysis of Dr. Leinen's opinion. *See Newbold v. Colvin*, 718 F.3d 1257, 1266 (10th Cir. 2013).

      *e.    The ALJ's Comment Regarding Plaintiff's Motivation for Seeking Disability Benefits*

Finally, Plaintiff criticizes the ALJ's comment that he "questioned" Plaintiff's "motivation for seeking disability" because in May 2012 Plaintiff told Dr. Leinen that she was "seeking temporary disability in order to have lumbar fusion surgery" and in August 2012 she reported that she "had a new job which will allow her [to obtain] insurance." Pl.'s Br. at 12-13; R. 19; *see* R. 334, 337. Whether or not the ALJ had good reason to question Plaintiff's motivation, it is clear from the ALJ's decision that he did not rely upon this questioning in reaching any determination challenged by Plaintiff; rather, the comment is made in the course of the ALJ's recitation of the medical evidence and not specifically cited as support for any conclusion. Moreover, even if the ALJ had based any challenged decision on a negative inference regarding Plaintiff's motivation, the Court as set forth above has found that those decisions are supported by substantial evidence absent any such inference. *Cf. Dixon v. Colvin*, 556 F. App'x 681, 683 (10th Cir. 2014) (finding no reversible error where two of the ALJ's three grounds for "assigning minimal weight to [a medical] opinion" were legally adequate and supported by substantial evidence).

      *f.    VE Hypothetical*

Finally, Plaintiff contends that the ALJ erred in relying on the VE's hearing testimony at step five because the hypothetical RFC presented to the VE did not "include any limitations" related to Plaintiff's pain. Pl.'s Br. at 7. The Court has already rejected Plaintiff's identical challenge to the ALJ's RFC assessment, however. "The ALJ

propounded a hypothetical question to the VE that included all the limitations that the ALJ ultimately included in his RFC assessment. Therefore, the VE's answer to that question provided a proper basis for the ALJ's disability decision." *Qualls*, 206 F.3d at 1373; *see* R. 17, 22, 50-51, 302-05.

## CONCLUSION

The final decision of the Commissioner is affirmed. A separate judgment shall be entered.

ENTERED this 15th day of November, 2016.

CHARLES B. GOODWIN
UNITED STATES MAGISTRATE JUDGE